## In re E–Z SERVE CONVENIENCE STORES, INC., et al., Debtors.

### No. 02–83138–11D.

United States Bankruptcy Court,
M.D. North Carolina,
Durham Division.

Feb. 24, 2003.

---

Paul R. Baynard, Charlotte, NC, for E–Z Serve Convenience Stores, Inc.

Richard M. Hutson, II, Durham, NC, pro se.

John A. Northen, Chapel Hill, NC, Terri Gardner, Raleigh, NC, Martin T. Fletcher, Baltimore, MD, for Richard M. Hutson, II.

## MEMORANDUM OPINION

CATHARINE R. CARRUTHERS, Bankruptcy Judge.

This matter coming on before the Court, after notice to all parties in interest, for hearing in Greensboro, North Carolina upon the motion by the Trustee for approval of the assumption, assignment and sale of the Debtors' interests under a lease (the "Lease") with Hartrampf Outdoor, LLP ("Hartrampt") and other property located at 5585 S. Chestatee Street in Dahlonega, Georgia (more commonly known in this proceeding as "Store 48") to Marvin Hewatt. Hartrampf filed an objection to the Trustee's proposed sale on the basis that the Lease includes a right of first refusal for the landlord.

This court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2). The Court, after receiving the testimony and the exhibits and reviewing the file, makes the following findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure:

## BACKGROUND

The Debtors formerly operated a convenience store business through direct ownership, indirect ownership and the lease of stores located throughout the southeast. At the time of the bankruptcy filing, the Debtors owned approximately 197 store locations and leased approximately 454 other locations. The Debtors also owned a substantial amount of equipment used in the operation of the convenience stores. GE Capital Franchise Finance Corporation ("GE Capital") held a claim against the Debtors in an aggregate principal amount of approximately $113 million secured by liens on a significant number of the Debtors' owned properties and equipment. GE Capital also held claims against certain special purpose entities wholly owned by the Debtors ("Debtors' SPEs") and related special purpose entities ("Related SPEs") in an aggregate principal amount of approximately $124 million. In addition, the Debtors were indebted to CIT Group/Business Credit Inc., the secured inventory lender, in the amount of approximately $17 million, with an additional exposure of approximately $4.1 million arising from outstanding stand-by letters of credit.

In the months preceding the bankruptcy, the Debtors had been losing money at an alarming rate. During this time period, the Debtors attempted to negotiate a consensual arrangement with the secured lenders, but were unable to reach an agreement. On October 4, 2002 the Debtors filed voluntary petitions seeking relief under Chapter 11 of the Bankruptcy Code with the intent to liquidate their assets in as orderly a fashion as possible. At the time of the filing, the Debtors had insufficient funds to pay accrued payroll or withholding taxes, had gasoline on the premises which constituted a potential environmental hazard, and had no ability to secure the stores from vandalism or theft. None of the landlords had been paid rent for the month of October, and certain landlords had not received their prepetition September rent. As a result, the automatic stay was immediately lifted to allow CIT to collect and liquidate the Debtors' inventory, which included perishable goods, gasoline and proceeds.

On October 18, 2002, upon motion by the Debtors, Richard M. Hutson, II (the "Trustee") was appointed to serve as the Chapter 11 trustee for all of the Debtors. In view of the lack of operating funds, the Trustee retained National Real Estate Clearinghouse, Inc. ("NRC") to coordinate and supervise a public sale of all fee properties, stores owned by the Debtors' SPEs, stores owned by the Related SPEs[1] and saleable leasehold interests. The Trustee also negotiated a post-petition credit facility with GE Capital to provide funds sufficient to protect and preserve the estate properties during the liquidation process. The Debtors' properties were marketed by NRC and the initial bid deadline for the offered properties was December 12, 2002. On December 31, 2002, the Trustee filed an Amended First Report of Acceptance of Bids in which he requested the approval of bids on more than 350 stores.

## STORE 48

Store 48 was included in the auction conducted by NRC and the Trustee's Amended First Report of Acceptance of Bids. Hartrampf is the owner of real property located at 5585 S. Chestatee Street in Dahlonega, Georgia, which is the location of Store 48. The original lessee was County Cupboard Foodstores, Inc., the Debtors' predecessor-in-interest. The Lease, signed in 1992, provides for a monthly rental rate effective January 1, 2001 through February 28, 2003 of $8,000 per calendar quarter, or $32,000 per year, and increasing each year thereafter. Hartrampf also owns the surrounding property, which is vacant land with future development plans, and the property across the street, which is also one of the Debtors' stores ("Store 68"). The Lease for Store 48 provides Hartrampf with a right of first

refusal. Paragraph 18(b) of the Lease states:

Lessor shall have the right during the term of this Lease to purchase the building, buildings or permanent improvements constructed on the land by Lessee on the same terms and conditions as those offered by Lessee to any party or parties, and Lessee shall immediately notify Lessor in writing of the identity of the party or parties making or receiving the same and the terms and conditions of such offer. Lessor, within thirty (30) days after receipt of such notice, may exercise this right by written notice to Lessee.

Apparently without knowledge of Hartrampf's right of first refusal, Marvin Hewatt ("Hewatt") submitted a bid for Store 48 in the amount of $250,000. Hewatt's bid was part of a larger all or nothing bid on a group of stores. Hartrampf was also an active bidder in the auction, placing a bid of $301,000 for Store 48. Nonetheless, the Trustee submitted Hewatt's bid in the amount of $250,000 to the court for approval based upon the position that the right of first refusal in the Lease is not binding on the Trustee pursuant to 11 U.S.C. § 365(f).

Hartrampf objected to the Trustee's motion for sale, and to assume and assign the Lease, on the basis that (1) the Hartrampf bid is the higher bid and should be accepted and (2) the right of first refusal in the Lease prevents the purchase by Hewatt since Hartrampf has made a higher bid. Jack Hartrampf provided testimony that the right of first refusal in the Lease was bargained for in exchange for a rent payment that is below market value. For example, the rent payment for Store 68,

---

1. The Debtors leased 76 stores owned by Related SPEs. The Trustee reached an agreement with the Related SPEs and GE Capital to allow for the inclusion of these stores in the auction process.

which is across the street and a comparable property, is higher. Jack Hartrampf provided further testimony that this right of first refusal was valuable because of larger development plans for the surrounding land and because Hartrampf agreed to certain non-compete clauses in the lease for Store 68 which limit the type of business that Hartrampf may own, operate or lease within one mile of Store 68. Therefore, the operation of a convenience store by a competitor at the location of Store 48 may put Hartrampf in violation of the noncompete clause in the lease for Store 68. Accordingly, Hartrampf contends that the right of first refusal has significant value and is part of the compensation for the lease agreement.

## ANALYSIS

A debtor's interest in a lease may be assumed or rejected pursuant to Section 365(b) of the Bankruptcy Code. Once an unexpired lease is assumed, that lease is property of the estate. When an executory contract or lease is assumed, it must be assumed *cum onere,* with all of its benefits and burdens. *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 531, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482 (1984). Debtors cannot assume favorable provisions of a lease and reject unfavorable provisions or rewrite the terms when assuming a lease. *In re Trak Auto Corp.,* 277 B.R. 655, 671 (Bankr.E.D.Va.2002). Prior to the assumption of the contract or lease, a debtor or a trustee must provide "adequate assurance of future performance." 11 U.S.C. § 365(b)(1)(C).

In addition, the Bankruptcy Code authorizes the trustee to assign most types of contracts the trustee has elected to assume. 11 U.S.C. § 365(f). While a trustee is required to assume a contract as a whole, the court may strike provisions that are contrary to the provisions of the

Bankruptcy Code such as those that place restrictions on assignment. The Trustee contends that the right of first refusal in the Lease for Store 48 is one such provision, and therefore, need not be honored by the Trustee. Section 365(f) of the Bankruptcy Code provides that anti-assignment clauses are not to be enforced by the court. In relevant part, Section 365(f) states:

(f)(1) Except as provided in subsection (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection . . .

(2) The trustee may assign an executory contract or unexpired lease of the debtor only if—

(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

(3) Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee.

11 U.S.C. § 365(f). Accordingly, under § 365(f), a lease may be assigned by the

debtor or trustee despite a provision in the lease which purports to restrict or prevent such assignment. Moreover, courts have applied 365(f) to "lease provisions that are so restrictive that they constitute de facto anti-assignment provisions." *In re LaSalle National Trust*, 288 B.R. 114, 123 (E.D.Va. 2003) (citing *In re Rickel Home Ctrs., Inc.*, 240 B.R. 826, 831 (D.Del.1998)).

■ De facto anti-assignment provisions may be found in a variety of forms including lease provisions that limit the permitted use of the leased premises, lease provisions that require payment of some portion of the proceeds or profit realized upon assignment, and cross-default provisions. *See, e.g., In re Jamesway Corporation*, 201 B.R. 73 (Bankr.S.D.N.Y.1996) (lease provision requiring tenant to pay landlord 50% to 60% of the "profits" received by tenant from the assignee or sublessee is unenforceable pursuant to § 365(f)(1)); *In re Howe*, 78 B.R. 226, 228 (Bankr.D.S.D.1987) (invalidating provision of executory sale contract conditioning consent to assignment upon payment by debtor of "assumption fee" equal to 4% of amount outstanding under contract); *Matter of U.L. Radio Corp.*, 19 B.R. 537 (Bankr.N.Y.1982) (debtor could assume and assign its lease to assignee who would operate premises as a small bistro even though lease contained clause providing that lessee could use premises only for television service and sales store); *In re Convenience USA, Inc.*, 2002 WL 230772, *7 (Bankr.M.D.N.C.2002) (when a debtor is a party to a number of unexpired leases, cross-default clauses that would prevent the debtor from assuming some of the leases without assuming others are unenforceable under § 365(f)).

■ Nonetheless, the court retains some discretion in determining whether a lease provision that does not explicitly prohibit assignment qualifies as a de facto anti-assignment clause thereby rendering it unenforceable. *In re Joshua Slocum, Ltd.*, 922 F.2d 1081, 1092 (3d Cir.1990); *In the Matter of Village of Rathskeller, Inc.*, 147 B.R. 665, 672 (Bankr.S.D.N.Y.1992); *In re Mr. Grocer*, 77 B.R. 349, 355 (Bankr. D.N.H.1987). A court must examine the particular facts and circumstances of the transaction to determine whether a lease clause restricts or conditions assignment including the extent to which the provision hampers a debtor's ability to assign, whether the provision would prevent the bankruptcy estate from realizing the full value of its assets, and the economic detriment to the non-debtor party. *See, e.g., In re Crow Winthrop Operating Partnership*, 241 F.3d 1121, 1124 (9th Cir.2001) (change in ownership provision providing that parking and management provisions would terminate if the debtor no longer owned premises prevented the debtor from realizing the full value of the estate); *In re Kopel*, 232 B.R. 57 (Bankr.E.D.N.Y.1999) ("enforcement of a cross-default provision should not be enforced where to do so would thwart the non-debtor party's bargain"); *In re Peterson's Ltd., Inc.*, 31 B.R. 524, 527 (Bankr.N.Y.1983) ("each proposed lease assumption and assignment must be looked at on the basis of its own unique facts to ensure that a proper balance is reached between the landlord's rights and those of the debtor-tenant.").

■ In support of his position, the Trustee relies upon *Mr. Grocer*, which is one of the few cases addressing the enforceability of a right of first refusal provision in a lease under § 365(f). In *Mr. Grocer*, the court held that any right of first refusal granted a landlord in a lease agreement is unenforceable by the Bankruptcy Code, purely based on the statutory language of § 365(f)(1). *Id.* at 353. In the alternative, the court concluded that enforcement of the right of first refusal would have a chilling effect on the sale,

thereby preventing the estate from receiving the best offer possible from prospective purchasers. *Id.* at 353–54. Further, in examining analogous situations, such as those involving permitted use, cross-default, and other lease provisions which are not themselves ipso facto anti-assignment provisions, the court concluded that the court retains the discretion to strike such a clause where there is no substantial economic detriment to the landlord shown and in which the debtor's estate would be prevented from realizing the full value of its assets. Specifically, the court concluded that "equitable power" continues to exist under the Bankruptcy Code to the extent that construction of the language "restricts or conditions the assignment" in § 365(f)(1) is necessary in a particular case upon its particular facts and circumstances." *Id.* at 354. Based on the facts of that case in which the landlord presented no evidence of economic detriment, the court determined that the landlord would receive the full benefit of his bargain despite the loss of his right of first refusal.

The reasoning presented by the court in *Mr. Grocer* is not applicable in this case. First, the facts and circumstances of this case are clearly distinguishable from those in *Mr. Grocer,* and, as recognized by the majority of courts, including *Mr. Grocer,* this court retains some discretion in determining whether a lease clause restricts or conditions assignment as prohibited by § 365(f). Second, this court disagrees with the conclusion that the statutory language of § 365(f)(1) renders any right of first refusal unenforceable and finds that

Hartrampf's right of first refusal is not within the scope of § 365(f).

Turning to the facts of this case, there is no evidence that the existence of a right of first refusal had a chilling effect on the sale procedure. It was clear from Hewatt's testimony in court that he was not aware of the individual terms of each lease upon which he placed a bid. Similarly, Hartrampf was clearly not aware of the amount of any competing bids submitted, since it submitted a bid in the amount of $301,000, $51,000 more than Hewatt's bid. Also, the landlord presented uncontested evidence of economic detriment. Hartrampf bargained for the right to purchase in the Lease, as is reflected in the favorable Lease rate in return for which Hartrampf received some ability to protect the value of its surrounding properties and to maintain compliance with its lease for Store 68. In addition, the Lease provision contains handwritten modifications to the right of first refusal which were initialed by the parties. The parties clearly negotiated this particular lease provision. The court finds that the right of first refusal was part of the compensation package for the Lease.

■ Therefore, the court finds that Hartrampf has shown that its right of first refusal is a material and bargained for element of the Lease which is economically significant to Hartrampf. A bankruptcy court's authority to excise a bargained for element of a contract is questionable and modification of a nondebtor contracting party's rights is not to be taken lightly. *In re Joshua Slocum Ltd.,* 922 F.2d 1081, 1091 (3d Cir.1991).[2] Without en-

---

**2.** The Fourth Circuit has clearly recognized the right of a non-debtor party to receive the full benefit of his or her bargain. In the context of determining whether to allow a landlord attorneys fees under § 365, the Fourth Circuit stated that pursuant to § 365, a "tenant who has defaulted under the terms of the lease can continue to possess property under favorable terms negotiated in better financial times, but in order to do so, the tenant must make the landlord whole for his losses and give him the benefit of his bargain." *In re Shangra–La, Inc.,* 167 F.3d 843, 848 (4th Cir.1999).

forcement of a lease provision that is part of the consideration due under the lease, a trustee or debtor cannot give adequate assurance of future performance. *Id.*[3] Accordingly, absent its right of first refusal, Hartrampf will not receive the full benefit of its bargain and the Trustee cannot give adequate assurance of future performance. *See In re Mr. Grocer,* 77 B.R. at 355 (citing *Matter of U.L. Radio Corp.,* 19 B.R. at 543). Based upon the facts and circumstances of this case, the court will not, in its discretion, excise the right of first refusal from the Lease.

More significantly, this court finds that Hartrampf's right of first refusal does not fall within the framework of § 365(f). One court described the objective of § 365(f)(3) as follows:

> The clear import of section 365(f)(3) is to invalidate any provision of an executory contract or unexpired lease which burdens the debtor's ability to make an effective assignment by modifying its terms so that the assignee receives a different agreement than the debtor had ... Congress adopted this policy favoring the assumption and assignment of contracts as a means of assisting a debtor in its rehabilitation or liquidation effort.

*In re David Orgell, Inc.,* 117 B.R. 574, 576 (Bankr.C.D.Cal.1990) (citations omitted).

The right of first refusal in this case does not restrict or burden the assignment of the lease. The holder of a right of first refusal can merely require the owner, when and if he decides to sell, to offer the property at the price he is willing to sell to a third party. The right of first refusal does not limit bidding on Store 48, nor does it compel the owner of property to sell at a price below that which may be offered in the open market. In order to exercise the right of first refusal, Hartrampf must equal or better the terms of a competing offer. There is no uncertainty as to whether the Trustee may assign the lease. Under the terms of the lease, the Trustee is free to assign the lease at any time, pursuant to the most favorable terms offered by any interested buyer, and the Debtors' estate is entitled to the full benefit of the best offer the Trustee can negotiate. Hartrampf merely has the right to match or better the best offer the Trustee can obtain. Hartrampf's right does not thwart the underlying policies of the Bankruptcy Code or hamper the Debtors' ability to reorganize.

Numerous courts have recognized a right of first refusal with no analysis of the application of 365(f). *In re Food Barn Stores, Inc.,* 107 F.3d 558 (8th Cir.1997); *In re Farmland Industries, Inc.,* 284 B.R. 111 (Bankr.W.D.Mo.2002) (bidding reopened to afford the holder of a right of first refusal an opportunity to exercise its contractual right of first refusal); *In re Table Talk, Inc.,* 53 B.R. 937 (Bankr. D.Mass.1985) (despite the failure of the trustee to obtain court approval prior to entering into a contract granting a right of first refusal, that right is effective and enforceable); *In the Matter of Wauka, Inc.,* 39 B.R. 734 (Bankr.N.D.Ga.1984) (since the right of first refusal included in a sales contract and warranty deed did not violate the rule against perpetuities, the holder would be permitted to exercise that right). A review of these cases reveals

---

**3.** In *Joshua Slocum,* the court ultimately based its holding upon a finding that the leased property was part of a shopping center, thereby subjecting it to the requirements of 365(b)(3). Even so, the court noted that even if the property were not a shopping center, the bankruptcy court's authority to excise a minimum sales requirement provision which is a bargained for element of a contract pursuant to 365(f) is questionable. *In re Joshua Slocum Ltd.,* 922 F.2d at 1091.

that the concern of these courts when presented with a contractual right of first refusal is not whether to enforce such right, but how to incorporate a right of first refusal into the bidding and sale procedures of the bankruptcy auction in a fair and equitable manner that still allows for maximization of the value of the estate.[4]

In *Food Barn*, the Eighth Circuit examined the competing concerns involved in judicial sale procedures. In that case, an unsuccessful bidder appealed both the bankruptcy court's decision to reopen the bidding after verbally approving a purchase agreement and the bankruptcy court's interpretation of its right of first refusal. In upholding the decisions of the bankruptcy court, the Court of Appeals delineated circumstances under which a bankruptcy court may, pursuant to its broad administrative power, upset the results of a judicial auction, including instances of fraud, unfairness or mistake. *In re Food Barn Stores, Inc.*, 107 F.3d at 564. The Court of Appeals also addressed the scope of the bidder's contractual right to match the competing offers. It found that the terms of the contractual right of first refusal conveyed "the privilege to secure assignment of the lease by equaling another bidder's offer, and the bankruptcy court scrupulously honored this aspect of the bargain." *Id.* at 567.

In *Farmland Industries*, the debtor filed a motion for the approval of the sale of property to a third party; however, at the hearing, the holder of a right of first refusal informed the court that it had not received notice of the sale procedures and desired to exercise its right. *In re Farmland Industries, Inc.*, 284 B.R. at 113. The court found that the holder of the right of first refusal had a contractual right to match the highest offer and that right entitled it to basic due process. The court stated "[i]t is entitled to receive notice that the Debtor has received an offer for another potential purchaser, and it is entitled to either exercise its right to match that offer or give up that right." *Id.* at 119.

*Farmland Industries* held that to approve the sale as requested by the debtor without notice and without an opportunity to match the bid would violate the principles established in *Food Barn*. The court reasoned:

> [A] court should reopen bidding, and thereby upset the results of a properly conducted judicial auction, only if "there was fraud, *unfairness or mistake* in the conduct of the sale ... or ... the price brought at the sale was so grossly inadequate as to shock the conscience of the court." The corollary of that is that the Court *should* upset the auction and reopen the bidding where, as in this case, a mistake has been made and there has been unfairness to a party.

---

4. Some courts have also discussed the issue of whether a right of first refusal is an executory contract. The majority of courts hold that it is an executory contract. *In re Kellstrom Industries, Inc.*, 286 B.R. 833, 834–835 (Bankr. D.Del.2002); *In re Coordinated Financial Planning Corp.*, 65 B.R. 711, 713 (9th Cir. BAP 1986); *In re Hardie*, 100 B.R. 284, 287 (Bankr.E.D.N.C.1989). *But see In re Bergt*, 241 B.R. 17 (Bankr.D.Alaska 1999). The essence of an executory contract is that the obligations of both parties are so far unperformed that the failure of either party to complete performance would constitute a material breach excusing the performance of the other. *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1045 (4th Cir. 1985) (quoting Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L.Rev. 439, 460 (1973)). Whether the right of first refusal is part of a larger executory contract or lease, or stands alone, should not alter the treatment of that right. The Trustee has chosen to assume the lease, which includes Hartrampf's right of first refusal.

*Id.* (citations omitted). *Farmland Industries* concluded that the holder of the right of first refusal must be afforded an opportunity to exercise its contractual right, and the court set forth bidding procedures accordingly.

In this case, as in *Farmland Industries,* the Trustee has asked the court to approve a sale pursuant to an auction process in which there was, perhaps inadvertently, unfairness and mistake. The auction procedure did not fully recognize and incorporate the property interests of non-debtor parties in the Debtors' estate. Such disregard for Hartrampf's interest in Store 48 is patently unfair and inequitable, particularly when there appears to be no benefit to the estate and a clear detriment to Hartrampf.

▉ And yet, the court is not unaware of the interest of Hewatt in Store 48, whose bid was tentatively accepted by the Trustee. A court must consider the reasonable expectations of the participants in a judicial sale. *In re Food Barn Stores, Inc.,* 107 F.3d at 565 (citing *In re Gil–Bern Industries,* 526 F.2d 627 (1st Cir.1975)).

> At some point, such as when the court actually enters an order approving the sale, expectations become sufficiently crystallized so as to render it improper to frustrate anticipated results except in the limited circumstances where there is a grossly inadequate price or fraud in the conduct of the proceedings. In other situations, where the sale had not progressed to a comparable plateau, a reviewing court should evaluate the bankruptcy judge's decisions on a case by case basis, with due regard both for the parties' expectations and the judge's broad discretion to weigh the multifarious interests involved.

*Id.* (citations omitted). The bidding procedures in this case clearly provided that all bids were subject to court approval and the court had not yet entered an order approving the sale. Furthermore, subsequent to the initial court approved bidding period, the Trustee has requested, and the court has allowed, some amount of flexibility in the bidding process to negotiate terms of a written bid, modify the scope of all or nothing bids and otherwise address adequate assurance considerations. Accordingly, the auction of the Debtors' stores has been a flexible process in which the court has attempted to balance the interests of all parties involved. The court cannot find that Hewatt's expectations had risen to a level that would preclude the court from denying approval of the sale.

Finally, the court notes that the sale of Store 48 to Hewatt is simply not in the best interest of the estate. The Trustee has demonstrated no detriment to the estate if the court does not approve the sale of Store 48 to Hewatt. The Trustee has an offer from Hartrampf in the amount of $301,000. Aside from any issues related to Hartrampf's right of first refusal, the approval of Hewatt's bid by the court is not in the best interest of the estate. The Trustee received a timely bid by Hartrampt which is $51,000 in excess of the bid by Hewatt. While it is true that Hewatt's bid was originally part of an "all or nothing bid," Hewatt testified that he would not necessarily withdraw his bid on other stores if Store 48 was not included. Subsequent to the hearing, Hewatt did not request that the Trustee withdraw or continue his bids on the remainder of the stores which were part of his all or nothing bid, pending a decision by the court in regards to Store 48. Rather, the Trustee submitted orders to the court to confirm the sales of the remaining stores to Hewatt. Those orders have been entered by the court. The parties' actions indicate that the bid on Store 48 is not part of a larger all or nothing bid, and its fate may

be determined separately. Based on this series of events, the court is presented with a bid by Hewatt in the amount of $250,000, and a bid by Hartrampf in the amount of $301,000. Hewatt's bid is not the best offer available to the estate.

After considering the competing considerations of the reasonable expectations of the bidders, the need for finality in the bidding process, fairness and equity, and maximization of the value of the assets of the estate, the Trustee's motion for approval of the assumption, assignment and sale of Store 48 to Marvin Hewatt is denied. An Order will be entered consistent with this Memorandum Opinion.